## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

  vs.                                                    No. 14-CR-03091-MV

PHILLIP CHAVIRA, SR.,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Phillip Chavira, Sr.'s Motion to Suppress Evidence [Doc. 22]. The government responded to the Motion and Defendant Chavira replied [Docs. 23, 24]. A hearing was held on the Motion on August 13, 2015; at the conclusion of the parties' factual presentations, the Court ordered that the parties submit their closing arguments in the form of supplemental briefs. Both the government and Defendant complied. *See generally* Docs. 37, 40. The Court, having considered the Motion, briefs, testimony, relevant law, and being otherwise fully-informed, finds that the Motion is well-taken and therefore will be **GRANTED.**

## BACKGROUND

Given the heavily fact-contingent nature of the law governing this dispute, considerable foundation must be laid prior to engaging in any legal analysis. On February 26, 2014, officers with the Belen, New Mexico Police Department ("BPD")

1

learned that Phillip Chavira, Sr., "had a warrant for his arrest." Doc. 34 at 12.
During the course of his routine patrol, BPD Officer Enrique Valdez "observed a
male subject," identified as Defendant, "approach a white Monte Carlo which was
parked in front of the residence" at 1115 South Main Street in Belen. *Id.* at 13.
Upon executing a u-turn, Officer Valdez "observed the same vehicle, [the] Monte
Carlo, pull out onto Main Street, [and] travel north on Main Street." *Id.* Aware
that the vehicle's driver, Defendant Chavira, was the subject of an outstanding
arrest warrant, the officer "initiated a traffic stop" by "activat[ing] [his] emergency
equipment." *Id.* at 13-14, 34. Defendant complied, and the Monte Carlo pulled into
the private parking lot between the "Adams Market and the feed store." *Id.* at 14.
The parking lot also abutted a closed "Lube Express" oil change provider and
"Trujeque's Car Wash." *Id.* at 32-33.

At this time, Officer Valdez immediately placed Defendant under arrest,
"handcuffed him," and confined Defendant in "the rear seat of [the] patrol car." *Id.*
at 14, 36. Once Chavira had been secured in the police car, Officer Valdez decided
that Defendant's "vehicle was to be towed," so he "called right away for a tow truck."
*Id.* at 14, 36-37. The officer testified that, in his view, impounding the vehicle
immediately was consistent with the "[s]tandard practice" of the BPD. *Id.* at 19.
Officer Valdez clarified that while he was unfamiliar with the BPD's standard
operating procedure governing impoundment, "since [he] started" with the police
department, the unofficial practice has been to refrain from impounding a vehicle

after the arrest of its driver *only* where "the driver, owner of the vehicle allows" a

"passenger in the vehicle" to "move that vehicle from the location." *Id.* at 20.

Despite this characterization of the appropriate protocol, the officer

responded that it is not his practice to impound a vehicle if it is parked at the

"residence of the person being arrested." *Id.* Yet more confusingly, Officer Valdez

explained his decision to impound the vehicle as predicated on the fact that the

parking lot was located in "a high-crime area," despite testifying moments earlier

that, irrespective of where the vehicle was parked, it was informal BPD procedure

to impound *all* vehicles *unless* a passenger was present to take lawful custody of

the car from the arrested driver. *Id.* However the officer reached his decision, it is

undisputed that he called for a truck to collect the Monte Carlo and transport it to

the impound lot.

After determining that it would be appropriate to have the vehicle towed

from its current location, Officer Valdez conducted an inventory search of the Monte

Carlo, stating that the BPD is "responsible for what's in that vehicle" such that all

"belongings in that vehicle" should be "documented on that tow sheet." *Id.* at 21, 39.

During his inspection of the interior, Officer Valdez noticed that the "center console

[of the Monte Carlo] was loose." *Id.* The officer then "just very simply just [sic]

lifted up" the "top portion" of the center console, exposing a "secondary

compartment" that contained United States currency and a "white crystal-like

substance" in a plastic bag. *Id.* at 22-23. This "secondary compartment" described

by Officer Valdez is, in reality, a utility console through which a "wiring harness"

3

runs to "provide[] the electricity to the gear shifter and cigarette lighter" and "is not a factory-made storage area" intended for consumer use.  *Id.* at 58-59.  Upon discovering what he believed to be contraband, Officer Valdez ceased his inventory search of the Monte Carlo and waited for the tow truck to arrive.  *Id.* at 23.

On the basis of the items revealed during the inventory search, BPD officers secured a search warrant for the remainder of the vehicle.  *Id.* at 23-24.  Execution of this warrant revealed narcotics in the above-described "second compartment" and what appeared to be a black handgun.  *Id.*  BPD Detective Benavidez duly ceased his search and "petitioned the Court for a second search warrant," which was issued shortly thereafter.  *Id.* at 25.  In aggregate, the searches of the Monte Carlo yielded relatively small quantities of methamphetamine, heroin, cocaine, and Suboxone, which are not charged in the Indictment, and the two firearms that form the basis of the instant prosecution.  *See, e.g.*, Doc. 23 at 2.

Months later, on September 9, 2014, a federal grand jury returned an indictment against Chavira, charging him with possession of the firearms discovered during the February 26 inventory search of the Monte Carlo.  *See generally* Doc. 2.  The same day, a federal warrant issued for Chavira's arrest.  *See generally* Doc. 3.  The following month, on October 8, 2014, Defendant was arrested pursuant to the federal warrant; ATF Special Agents Kevin Wolfe and Ruben Chávez then transported Chavira from the Valencia County Detention Center to the federal courthouse in Albuquerque to be arraigned.  *See* Doc. 34 at 44-45, 47.  *See also* Doc. 38 at 2.

During the drive from Belen to Albuquerque, Defendant initiated a conversation with the Special Agents by inquiring as to the status of a monetary bond that his family had posted for his release from state custody. Ex. 15 at 0:01. Special Agent Wolfe, instead of responding to the question, informed Defendant that "before we do anything else" the Special Agent would inform Chavira of his rights. *Id.* at 0:16. Special Agent Wolfe then accurately recited the *Miranda* warnings; when asked if he had understood Special Agent Wolfe's explanation, Chavira responded, "yes, sir." *Id.* at 0:16-0:36. Over the course of the conversation, Defendant admitted that the "eight ball of black [tar heroin]" found in the Monte Carlo belonged to him, but denied ownership of either the guns or the other contraband in the vehicle. *Id.* at 2:57-3:00. Defendant also related that he was withdrawing from heroin, indicating that he did not feel well as a result. Doc. 34 at 48-49.

## DISCUSSION

### I.   Standing to Contest the Search

Although not revived in the United States' Motion to Supplement its Prior Pleadings and the Government's Closing Argument [Doc. 40], the government, in its Response, noted that Defendant had not established standing to contest the inventory search of the Monte Carlo. *See* Doc. 23 at 3-4. Testimony elicited at the hearing on the Motion leaves no doubt that Defendant has standing to maintain the instant Motion.

With respect to vehicle searches in cases where the initial seizure of the Defendant and the automobile is not contested, the "standing" question resolves to the "classic Fourth Amendment test:  whether the defendant manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as objectively reasonable." *United States v. Eckart*, 569 F.3d 1263, 1274 (10th Cir. 2009) (internal quotation marks omitted).  In cases, such as the one at bar, where a defendant is not the registered owner of an automobile, while he "need not submit legal documentation showing a chain of lawful custody from the registered owner to himself," he nonetheless "bears the burden of establishing that he gained possession from the owner or someone with authority to grant possession." *United States v. Valdez-Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003).  Here, Defendant has emphatically met this burden.

Defense investigator, Danny Garcia, determined that, on the date of the search, the vehicle was registered to Phillip A. Chavira, Defendant's son.  Doc. 34 at 60.  Phillip Chavira, Jr. confirmed during his testimony that the Monte Carlo that BPD officers impounded and searched on February 26, 2014 was registered in his name as of that date.  *Id.* at 63.  Moreover, he explained that, on the day in question, he had lent the Monte Carlo to his father, the Defendant, so that his father could "go pick up [Chavira, Jr.'s] auntie from the Rail Runner station."  *Id.* at 64.  The uncontroverted evidence thus plainly establishes that Defendant "gained possession" of the Monte Carlo "from the owner or someone with authority to grant

possession," such that Chavira may maintain his challenge to the search in question.  *See Valdez-Hocker*, 333 F.3d at 1209.

## II.    Vehicle Impoundment and Inventory Searches

The Tenth Circuit recently clarified the constitutional limits imposed on vehicle impoundments and the inventory searches conducted incident thereto.  In *United States v. Sanders*, the court held "that impoundment of a vehicle located on private property that is neither obstructing traffic nor creating an imminent threat to public safety is constitutional ***only if*** justified by ***both*** a standardized policy ***and*** a reasonable, non-pretextual community-caretaking rationale."  *United States v. Sanders*, -- F.3d --, 2015 WL 4665653, at *7 (10th Cir. Aug. 7, 2015) (emphasis added).  The panel elaborated that while "[a]scertaining whether an impoundment is justified by a reasonable and legitimate, non-pretextual community-caretaking rationale is not an easy task," certain factors may prove useful to district courts, including, "(1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment."  *Id.* at *8.  Given the Tenth Circuit's express statement that "[u]nder [the] holding [in *Sanders*], either failure alone would be sufficient to establish unconstitutionality," and therefore mandate suppression, the Court will begin its analysis with the

"community-caretaking" prong, which it believes is dispositive in the instant case. *Id.* at *1.

A straightforward application of the factors articulated by the Tenth Circuit reveals that the impoundment of the Monte Carlo and subsequent inventory search thereof were unconstitutional. First, the Monte Carlo, like the automobile in *Sanders*, was appropriately parked in a private lot adjacent to several businesses. *See id.* at *9. *See also* Doc. 34 at 15. Second, BPD officers made no effort to consult with the owner of the parking lot, the managers of any of the businesses surrounding the lot, or, indeed, with anyone at all, regarding the possibility of leaving the vehicle where it had been parked. To the contrary, Officer Valdez agreed that he "called right away for a tow truck" after arresting Chavira without assessing the feasibility of securing the Monte Carlo in the parking lot. *Id.* at 36. Moreover, the Court is not persuaded by the government's argument that because there were "several businesses nearby" it is "unclear... how Officer Valdez would have ascertained the identity of the owner." Doc. 40 at 6. Plainly, Officer Valdez, or any of the other BPD officers that eventually arrived at the scene, could have inquired of the relevant store personnel who owned the lot or what provision had been made for its management.

Third, despite the government's protestations to the contrary, there were several alternatives to impoundment available. In addition to securing the vehicle in place, the officers could simply have called a family member to retrieve the automobile from the private lot. This option appears particularly feasible given

that Officer Valdez watched Defendant leave his home in the Monte Carlo and therefore knew that the location from which the vehicle was towed was a mere half-mile from that residence; patently, a relative or friend could have walked to the lot and taken custody of the car. *See, e.g.*, Doc. 37, Appendix A.  Indeed, given the circumstances of this case, placing a phone call to Chavira's home may well have ensured removal of the Monte Carlo more quickly than could have been achieved by calling a tow service.

Fourth, Defendant was arrested on a warrant pursuant to a New Mexico criminal complaint charging Chavira with various drug offenses that, insofar as the Court is aware, in no way implicate the Monte Carlo impounded in this case. *See* Doc. 37 at 7.  Fifth and finally, there is no suggestion whatsoever that either Defendant or his son consented to the impoundment of the vehicle.  As none of the five factors supports Officer Valdez's unilateral and summary decision to impound the Monte Carlo, the Court finds that the impoundment and attendant inventory search were unconstitutional and that any evidence obtained therefrom must be suppressed.  Having reached this conclusion, the Court need not discuss either the BPD standard operating procedure or the mechanics of the inventory search itself.

## III.   Defendant's Post-Arrest Statements

The government concedes that if the "inventory search of the Monte Carlo was in violation of the Fourth Amendment," then "the government cannot argue that the statement was voluntary under the Fourth Amendment and this analysis of attenuation ends." Doc. 40 at 18.  The Court agrees.

Where a defendant demonstrates that his "Fourth Amendment rights were violated" and that there is a "factual nexus between the illegality and the challenged evidence" such that "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct," the evidence in question may be tainted and, therefore, subject to suppression. *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006) (internal quotation marks and citations omitted). *See also United States v. Martinez*, 696 F. Supp. 2d 1216, 1236-37 (D.N.M. 2010) ("For the exclusionary rule to apply, the defendant need show only, by a preponderance of the evidence, a constitutional violation, and a causal nexus between the violation and the evidence sought to be excluded."). It is well-established, however, that "even if" a defendant "can demonstrate that the [challenged] evidence resulted from" an unconstitutional search, the "government may avoid suppression by demonstrating that the evidence would have been inevitably discovered, that it was discovered by independent means, or that it was so attenuated from the illegality as to dissipate any taint from the Fourth Amendment violation." *Torres-Castro*, 470 F.3d at 999. As the supplemental briefs in this case make clear, the sole exception at issue here is whether the constitutional violation is sufficiently separated from Chavira's statements to render them admissible. *See* Doc. 37 at 12-13. *See also* Doc. 40 at 16-17.

As this Court has explained before, to "determine whether evidence obtained by officers subsequent to an illegal detention was purged of the taint from an unlawful intrusion, courts apply the analysis set forth in *Brown v. Illinois*." *United*

*States v. Robinson*, 932 F. Supp. 1271, 1278 (D.N.M. 1996) (Vázquez, J.). "In

*Brown*," this Court continued, "the Supreme Court identified three factors relevant

to" this analysis: "1) the temporal proximity of the statements to the Fourth

Amendment violation; 2) the existence of intervening causes between the violation

and the statements; and 3) the purpose or flagrancy of the official misconduct." *Id.*

*See also Torres-Castro*, 470 F.3d at 999 (also applying the *Brown* factors).  The

"heavy burden" rests squarely with the government to establish, based on the

totality of the circumstances, that there has been "'a sufficient attenuation or break

in the causal connection between the illegal detention and the consent.'" *United*

*States v. Fox*, 600 F.3d 1253, 1259 (10th Cir. 2010) (quoting *United States v.*

*Gregory*, 79 F.3d 973 979 (10th Cir. 1996)).  Here, none of the factors favors

admission of the evidence, such that the government cannot meet its burden.

     First, the "temporal proximity" factor does not weigh in favor of finding that

the "taint" of the unconstitutional impoundment and subsequent search have been

"purged."  As an initial matter, this Court joins the Sixth Circuit in observing that

the meaning of this factor is "ambiguous" and "must be considered in light of the

conditions and circumstances that occurred during the time frame in question."

*United States v. Shaw*, 464 F.3d 615, 628 (6th Cir. 2006).  The facts here present a

relatively novel set of circumstances, in that, the confession at issue took place

several months after the unconstitutional search.  However, the evidence uncovered

during that search forms the sole factual predicate for the indictment that put

Defendant into ATF custody.  *See generally* Docs. 1, 11.  That is, absent the

unconstitutional search, there would be no federal indictment charging Chavira, such that he would never have been in ATF custody to make a statement. Viewed in this way, the initial illegality of the impoundment and search were, in effect, revivified by an indictment and arrest predicated on tainted evidence, such that the statement came at the end of a chain of prolonged illegal conduct.

Second, there were no "intervening circumstances" that would abate the effect of the illegal search. While it is true that thorough and competent *Miranda* warnings, such as those issued by Special Agent Wolfe in this case, *may* constitute an "intervening circumstance," they are generally not sufficient, without more, to break the causal chain. *See, e.g.*, *Fox*, 600 F.3d at 1260; *Kaupp v. Texas*, 538 U.S. 626, 633 (2003) ("we held in *Brown* that *Miranda* warnings, *alone* and *per se,* cannot always ... break, for Fourth Amendment purposes, the causal connection between the illegality and the confession."). The Court finds that here, the *Miranda* warnings cannot outweigh the fact that the ATF agents referred in their questioning to illegally obtained evidence. *See, e.g.*, *United States v. Shetler*, 665 F.3d 1150, 1158 (9th Cir. 2011) (noting the issues associated with officers "confront[ing] the suspect, either physically or verbally, with the evidence that has been illegally obtained" and a suspect's "knowledge that the officials had already seized certain evidence"). Here, any purgative effect associated with *Miranda* are simply overwhelmed by the corrupting influence of the tainted evidence on the interrogation.

Third and finally, the BPD misconduct at the center of this motion was flagrant and, in the Court's estimation, dedicated to conducting a warrantless investigation.  As discussed above, Officer Valdez decided to impound and inventory the Monte Carlo without any serious consideration as to whether there were feasible alternatives to towing the automobile.  This conclusion is buttressed by the manner in which Officer Valdez conducted his "inventory search," which included removing a portion of the center console that he deemed "loose" in order to see what might be beneath it.  *See, e.g.*, Doc. 34 at 21-23.  On these facts, the Court finds that the government cannot meet its burden and that, therefore, Chavira's statements to the ATF must be suppressed.

## CONCLUSION

Analysis of the factors articulated by the Tenth Circuit in *United States v. Sanders* lead this Court to conclude that the impoundment and attendant inventory search of the Monte Carlo were mere pretexts for an unconstitutional investigative search.  Any statements Chavira made to the ATF were also a product of this initial illegality and, therefore, must also be suppressed.

**IT IS THEREFORE ORDERED** Defendant's Motion to Suppress Evidence [Doc. 22] is **GRANTED.**

Dated this 6th day of October, 2015.

_____
**MARTHA VÁZQUEZ**
UNITED STATES DISTRICT JUDGE